LAURA BOSWELL (Bar No. 12449)
MARY ANNE DAVIES (Bar No. 14965)
**DISABILITY LAW CENTER**
205 North 400 West
Salt Lake City, Utah 84103
Phone: 801.363.1347
Fax:     801.363.1437
Email: lhenrie@disabilitylawcenter.org
          rguimaraes@disabilitylawcenter.org
          mdavies@disabilitylawcenter.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MARKIE LLOYD and NATALIA SHAW,**<br><br>Plaintiffs,<br><br>v.<br><br>**OVERSTOCK.COM, INC.,**<br><br>Defendant. | **COMPLAINT**<br>**(JURY DEMANDED)**<br><br><br>Civil No. _____<br><br>Judge _____ |

Markie Dunn Lloyd and Natalia Salas Shaw ("Ms. Lloyd" and "Ms. Shaw" or "Plaintiffs"),

by and through their attorneys, hereby complain and allege against Defendant Overstock.com, Inc.

("Overstock" or "Defendant") as follows:

## I.     NATURE OF THE CLAIMS

1.     This suit is brought by Plaintiffs Ms. Lloyd and Ms. Shaw under the Americans with Disabilities Amendments Act, codified at 42 U.S.C. §§ 12101 *et seq.* ("ADA-AA"), for disability discrimination and retaliation. Plaintiffs seek injunctive and equitable relief, monetary relief as compensation for the Defendant's violations of their rights under the ADA-AA, and attorney fees and costs pursuant to 42 U.S.C. § 12205.

## II.     PARTIES

2.     Overstock is a corporation organized under the laws of the State of Delaware, with its headquarters at 799 West Coliseum Way, Midvale, Utah 84047.

3.     Overstock is a corporation that employs more than fifteen employees.

4.     Ms. Lloyd is an individual residing in Tooele County, Utah. At all times relevant to this Complaint, Ms. Lloyd resided in Tooele County.

5.     Ms. Shaw is an individual residing in Weber County, Utah. At all times relevant to this Complaint, Ms. Shaw resided in Weber County.

## III.     JURISDICTION AND VENUE

6.     Plaintiffs, having exhausted all available administrative remedies, now seek relief in Federal Court.

7.     This Court has jurisdiction to hear and decide Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and the ADA-AA, 42 U.S.C. §§ 12101 through 12213. This court has personal jurisdiction over the Defendant because the Defendant conducts business in the State of Utah.

8.      Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b) because all the employment practices alleged to be unlawful were committed within the jurisdiction of this Court.

## IV.     FACTUAL BACKGROUND

### A.      <u>Overstock's Content Moderation Team</u>

9.      Overstock is an online retailer of goods. Overstock's website allows customers to provide written reviews of the goods they have purchased.

10.     Overstock employees, known as content moderators, read customer reviews to ensure they meet the company's guidelines.  Content moderators then approve or deny customer-generated reviews.

11.     Content moderators work on the Content Moderation Team at Overstock.

12.     Upon information and belief, by 2012, Overstock's Content Moderation Team consisted primarily of individuals with health concerns that made it difficult to work in the office forty hours a week. However, these employees could work successfully from home on a flexible basis with a schedule that was convenient to their medical needs.

13.     The goal of the Content Moderation Team was to be flexible and allow content moderators to fulfill their hours at any time, including nighttime. Under this model, Overstock was able to save overhead costs associated with employees who are physically present in the office.

14.     Stormy Simon ("Ms. Simon"), the former president of Overstock, established the Content Moderation Team model as a team on which employees with medical conditions could work and be successful in a full-time position.

15.     It was known by those in Overstock management that the Content Moderation Team was a team to which employees could transfer if they began to experience health-related concerns.

16.     On or about June 6, 2016, Ms. Simon began a leave of absence and then announced she had resigned effective July 25, 2016.

17.     On approximately June 24, 2016, Nariman Noursalehi ("Mr. Noursalehi"), Director of Marketing, sent an email to the teams he managed, including the Content Moderation Team, announcing his decision to cease the practice of working from home and that employees were expected to be in the office on July 5, 2016.

18.     The email also stated that for those employees who indefinitely worked from home, the change in the work-from-home policy may be a challenge, but they were nevertheless expected to be in the office on July 5, 2016.   This change effectively ended the work-from-home accommodation that had been provided to the Content Moderation Team members with medical conditions that made it difficult to work in the office.

19.     After the change in the work-from-home policy was implemented, at least two content moderators were terminated. Upon information and belief, several others resigned.

20.     Upon information and belief, Overstock reinstated the work-from-home option shortly after several employees on the Content Moderation Team were terminated or resigned.

21.     According to the Bureau of Labor Statistics, just 18.7% of persons with a disability were employed in the United States in 2017, compared to 65.7% of those persons

without a disability. *See* BUREAU OF LABOR AND STATISTICS,

https://www.bls.gov/news.release/disabl.nr0.htm  (last visited December 16, 2018).

22.     People with disabilities face many barriers to employment, including a lack of reasonable accommodations that will enable them to do their job.

23.     Working from home and flexible schedules may be reasonable accommodations for employees with disabilities.

24.     A 2012 report by the Bureau of Labor Statistics indicates that 24.5% of employees with a disability worked from home, compared with 20.2% of those with no disability. *See* BUREAU OF LABOR STATISTIC, PERSONS WITH A DISABILITY: BARRIERS TO EMPLOYMENT, TYPES OF ASSISTANCE, AND OTHER LABOR-RELATED ISSUES-MAY 2012, 4 (April 24, 2013) https://www.bls.gov/news.release/archives/dissup_04242013.pdf.

*25.*     Employed persons with a disability were more likely than those with no disability to have a flexible work schedule.  *See Id.*


**B.      Natalia Salas Shaw**

26.     Ms. Shaw worked for Overstock as a content moderator from approximately December 2012 through June 2016.

27.     Ms. Shaw first learned about the position from Ms. Simon. Ms. Simon recruited Ms. Shaw through the National Multiple Sclerosis Society and offered her a position on the Content Moderation Team. Ms. Simon explained to Ms. Shaw that the Content Moderation Team was modeled to give employees with health conditions a full-time job with maximum flexibility.

28.     As an individual with Multiple Sclerosis ("MS"), Ms. Shaw experiences migraines, body aches, and fatigue, among other symptoms. These symptoms make it difficult for Ms. Shaw to work full-time in an office, which made the Content Moderation Team an ideal fit for Ms. Shaw's needs.

29.     Ms. Shaw's condition substantially limits major life activities, including but not limited to concentrating, thinking, lifting, speaking, and the function of her neurological system.

30.     As a member of the Content Moderation Team, Ms. Shaw was responsible for assessing and approving user reviews to ensure they met Overstock's content guidelines. All of her content moderation tasks could be completed online.

31.     Ms. Shaw worked approximately forty hours per week and was permitted to complete those hours at any time during the week, including evenings and weekends.

32.     Ms. Shaw occasionally came into the office for meetings, but worked almost exclusively from home.

33.     Ms. Shaw's flexible schedule allowed her to work when she was feeling well and was not experiencing pain or other debilitating symptoms.

34.     Over the course of her employment, Ms. Shaw had several supervisors. Until approximately late May 2016, Ms. Shaw's supervisors never expressed any concerns regarding her flexible work-from-home arrangement. Two of Ms. Shaw's supervisors, including Mr. Jardy Stokes ("Mr. Stokes"), expressed contentment that she was able to work odd hours, including nighttime, because there were not other content moderators working these hours.

35.     Ms. Shaw consistently received satisfactory performance reviews from her supervisors.

36.     During approximately the last two months of Ms. Shaw's employment at Overstock, Mr. Stokes asked Ms. Shaw to begin contacting him via email if she had a difficult day or something out of the ordinary arose. Ms. Shaw complied with this request.

37.     In approximately late May 2016, Mr. Stokes informed Ms. Shaw that she needed to start checking in with him daily via email so that he knew she was working.

38.     In the approximately three years Ms. Shaw had worked for Overstock, she had never been required to report daily to her supervisor.

39.     Ms. Shaw complied and reported to Mr. Stokes every day for several consecutive days by sending him a brief message to let him know she was working that day. Mr. Stokes did not respond to any of her emails.

40.     Based on Mr. Stokes' lack of response and Ms. Shaw's prior working relationship with Mr. Stokes, Ms. Shaw became unsure as to whether she needed to report daily or only on an as-needed basis. So Ms. Shaw ceased checking in daily with Mr. Stokes.

41.     Approximately two weeks later, on June 20, 2016, Mr. Stokes again asked Ms. Shaw to report to him daily and Ms. Shaw complied.

42.     A few days later, in the evening of approximately June 23, 2016, Mr. Stokes informed Ms. Shaw via text message that she needed to come into the office because there had been a change in the work-from-home policy.  Ms. Shaw was told she must come to work the next day or face termination.

43.     Ms. Shaw informed Mr. Stokes that she could not come into the office as requested because she could not drive due to her medical condition.

44.     Ms. Shaw also explained to Mr. Stokes that everyday tasks in the office can be difficult due to her health condition.  Ms. Shaw gave examples such as her ability to sit in a chair for long periods of time is compromised due to muscle spasms and body aches. Other examples included Ms. Shaw's migraines which are triggered by looking at a screen for too long, requiring a quiet place to for her to recover, as well as extreme fatigue.

45.     Mr. Stokes responded that Ms. Shaw must come into the office the following Monday, June 27, 2016.

46.     On or about June 27, 2016, Ms. Shaw sent a text message to Mr. Stokes to inform him that she could not come into the office.

47.     Mr. Stokes did not mention ADA paperwork or discuss possible accommodations throughout the course of his communication with Ms. Shaw.

48.     The following day, on approximately Tuesday, June 28, 2016, Mr. Stokes held a meeting with Ms. Shaw and a Human Resources representative and terminated her employment.

49.     Mr. Stokes informed Ms. Shaw that she was being terminated for failing to continue to check in, unexcused absences, and tardiness.

50.     Mr. Stokes stated that the number of times Ms. Shaw had used paid time off ("PTO") without first getting approval from a supervisor were considered unexcused. During her approximately three years of employment at Overstock, Ms. Shaw had not been required to receive

approval before using her PTO, nor did she face disciplinary measures prior to her termination for using her PTO without prior approval.

51.     Ms. Shaw had not previously faced disciplinary measures for tardiness because she did not have a set schedule other than to complete forty hours per week, and therefore could not be tardy.

52.     Ms. Shaw complained to Mr. Stokes that she should not be terminated based on her need for a work-from-home accommodation. Mr. Stokes responded that Ms. Shaw's work-from-home arrangement was not an accommodation but rather a "privilege" that she had lost due to her alleged poor performance.

53.     Ms. Shaw never received verbal or written notice from Mr. Stokes that not abiding by his request for daily reporting could subject her to termination.

54.     Ms. Shaw had never been instructed to request a supervisor's approval before using her accrued PTO. Ms. Shaw had never received a prior verbal or written warning that her PTO use was improper in any way.

55.     Ms. Shaw learned of Overstock's concerns with her daily reporting and use of PTO for the first time during the phone call in which she was terminated.

56.     Ms. Shaw's disciplinary process and termination did not follow Overstock's typical procedure. During Ms. Shaw's time at Overstock, an employee with alleged performance issues would first have a coaching session with his or her supervisor, followed by a summary of discussion to outline a plan to correct the performance, then a verbal warning, a written warning,

and finally termination if the prior corrective measures were unsuccessful.  Ms. Shaw did not have a coaching session, a summary of discussion, or a verbal warning.

57.     On or around February 27, 2017, Ms. Shaw filed paperwork with the United States Equal Employment Opportunity Commission ("EEOC") to initiate a Charge of Discrimination.

58.     On or around July 31, 2017, Ms. Shaw filed a timely Charge of Discrimination with the EEOC, alleging failure to accommodate, retaliation, disparate impact, and discrimination on the basis of disability.

59.     On or around September 20, 2018, the Disability Law Center received a Dismissal and Notice of Rights letter ("Right to Sue" letter) from the EEOC on behalf of Ms. Shaw, indicating that no further action would be taken by the EEOC. Ms. Shaw did not receive a copy of her Right to Sue letter until her counsel forwarded her a copy on approximately October 3, 2018.

## C.     Markie Dunn Lloyd

60.     Markie Lloyd began working for Overstock in 2011 as a Customer Service Representative.

61.     In approximately 2014, Ms. Lloyd began having difficulties working full-time in the office due to her symptoms of Multiple Sclerosis ("MS") so she began working from home.

62.     Ms. Lloyd continued to have difficulties working on the customer service team because her position required that she be available during the specific hours of her shift to have written correspondence with customers using Overstock's "chat" feature through the customer care center.

63.     Ms. Lloyd's MS symptoms led to debilitating headaches, backaches, and fatigue, among other symptoms, which led to attendance issues.

64.     Ms. Shaw's condition substantially limits major life activities, including but not limited to concentrating, thinking, walking, speaking, and the function of her neurological system.

65.      Ms. Lloyd was approached by the Customer Services Director, Troy Sawyer, who suggested that the Content Moderation Team would be a better fit for Ms. Lloyd because the team was more flexible for employees with medical conditions and older adults because all of their work could be completed online.

66.     Ms. Lloyd joined the Content Moderation Team and worked from home on the team for two years.

67.     Ms. Lloyd consistently received positive performance reviews as a content moderator.

68.     On approximately June 24, 2016, Ms. Lloyd received Mr. Noursalehi's email notifying her that he was ending the work-from-home arrangement for the teams he supervised.

69.     Despite the difficulty this requirement presented to Ms. Lloyd's health, she began to make arrangements to come into the office as requested by Mr. Noursalehi's email, and she made multiple reasonable accommodation requests over the course of July 2016 to Mr. Stokes and Lindsay Sweat, a human resources representative.

70.     Ms. Lloyd's accommodation requests included carpooling with her father, Greg Dunn, to the Overstock "Castle" location in Salt Lake City because she had difficulty driving and

was unable to drive herself to the "Old Mill" location in Cottonwood Heights. Ms. Lloyd repeatedly renewed this request, which Mr. Stokes declined.

71.     Ms. Lloyd also asked repeatedly if she could be allowed to work from home because she was suffering from an MS relapse. Ms. Stokes and Ms. Sweat responded by offering paperwork for leave under the Family and Medical Leave Act ("FMLA"), for which Ms. Lloyd applied. There was no discussion of ADA paperwork or possible accommodations during these discussions.

72.     On approximately July 18, 2016, Ms. Sweat for the first time provided Ms. Lloyd with the ADA paperwork to request an accommodation. Ms. Lloyd worked with her medical provider and promptly returned the paperwork.

73.     On or about July 18, 2016, Ms. Lloyd was unable to drive herself to the Old Mill location. Ms. Lloyd again requested that she be able to temporarily work from home or carpool to the Old Mill location while Overstock evaluated her reasonable accommodation request.

74.     Overstock denied Ms. Lloyd's request and as a result she was required to use her FMLA leave and simultaneously deplete her PTO even though she communicated to Overstock that she was willing and able to work.

75.     Ms. Lloyd was informed on or about July 28, 2016, that her accommodation paperwork had been transferred to Marcie Osterberg ("Ms. Osterberg") for review. Ms. Osterberg granted Ms. Lloyd a temporary work-from-home accommodation while she evaluated Ms. Lloyd's accommodation request.

76.     On approximately August 1, 2016, approximately one month after Ms. Lloyd made multiple reasonable accommodation requests that were still being evaluated, Mr. Stokes began to audit Ms. Lloyd's work from the prior six months.

77.     As a content moderator, Ms. Lloyd reviewed over 1,000 reviews per day, or approximately 100,000 reviews during a six-month period. Out of the approximately 100,000 reviews from Ms. Lloyd's prior six months, Mr. Stokes found that Ms. Lloyd had approved six reviews that did not meet Overstock's content guidelines regarding inappropriate language. Mr. Stokes informed Ms. Lloyd that he would take disciplinary action if it occurred again.

78.     Over a six-month period, the six reviews that did not meet Overstock's content guidelines represent a 0.006% error rate.

79.     This was the first time in the two years Ms. Lloyd worked on the Content Moderation Team that a supervisor did an audit of her work. In Ms. Lloyd's experience, errors were handled as a quality control issue and not as a disciplinary matter.

80.     On approximately August 23, 2016, Ms. Lloyd's accommodation request to either work from home or carpool to the Castle location was granted, but Ms. Lloyd was advised that the accommodation would be reevaluated after Overstock moved their headquarters to their "Peace Coliseum" location in September 2016. Ms. Lloyd was not told why a reevaluation would be required after the move.

81.     Ms. Lloyd's accommodation request to continue working from home as she had for the previous two years was granted nearly two months after she made her first request.

82.     The Disability Law Center sent a letter to Overstock on Ms. Lloyd's behalf on or about September 28, 2016, outlining legal violations and requesting that Ms. Lloyd be allowed to continue to work from home after Overstock's move to the Peace Coliseum.

83.     The next day, on approximately September 29, 2016, Mr. Stokes issued a final written warning to Ms. Lloyd, citing an additional five reviews that contained inappropriate content and Ms. Lloyd's failure to flag reviews correctly.

84.     Out of approximately 100,000 reviews, the additional five reviews, together with the six prior reviews found to contain inappropriate content, for a total of eleven reviews, represent a 0.011% error rate.

85.     In its employer position statement to the EEOC, Overstock stated that on November 9, 2016, Ms. Lloyd was terminated for alleged poor performance and, in particular, for approving an additional twelve reviews with inappropriate language.

86.     In its position statement, Overstock noted twenty-three total reviews with inappropriate content. Out of 100,000 reviews, this represents a 0.023% error rate.

87.     Previous documentation received by Ms. Lloyd referenced up to a possible twenty-seven reviews with inappropriate content, sixteen of which were never shown to Ms. Lloyd. Overstock's accounting of the number of reviews with inappropriate content contains discrepancies in its reporting.

88.     Ms. Lloyd's disciplinary process did not follow Overstock's typical procedure. During Ms. Lloyd's time at Overstock, an employee would first have a coaching session with his or her supervisor, followed by a summary of discussion to outline a plan to correct the

performance, then a verbal warning, a written warning, and finally termination.  Ms. Lloyd did not have a coaching session, a summary of discussion, or a verbal warning.

89.     On or around February 27, 2017, Ms. Lloyd filed paperwork with the EEOC to initiate a Charge of Discrimination.

90.     On or around July 31, 2017, Ms. Lloyd filed a timely Charge of Discrimination with the EEOC, alleging failure to accommodate, retaliation, disparate impact, and discrimination on the basis of disability.

91.     On or around September 24, 2018, Ms. Lloyd received a Dismissal and Notice of Rights letter ("Right to Sue" letter) from the EEOC, indicating that no further action would be taken by the EEOC.

## FIRST CLAIM FOR RELIEF

### Failure to Provide Reasonable Accommodations in Violation of the ADA-AA

92.     Plaintiffs incorporate herein by reference all of the allegations made in previous paragraphs, and further alleges as follows:

93.     Plaintiffs are individuals with disabilities as defined by the ADA-AA.

94.     Plaintiffs were qualified to perform the essential functions of a content moderator.

95.     Ms. Lloyd requested a temporary accommodation of working from home while her requests for permanent accommodation were under evaluation.

96.     Defendant denied Ms. Lloyd's temporary reasonable accommodation request and she was forced to deplete her PTO despite her ability and willingness to work.

97.     Defendant unnecessarily delayed in responding to Ms. Lloyd's request for a permanent reasonable accommodation by failing to discuss the accommodation paperwork with Ms. Lloyd until nearly a month after she made her first request, despite Ms. Lloyd's repeated requests for accommodation. Defendant then responded to Ms. Lloyd nearly two months after her first request for accommodation.

98.     Ms. Shaw requested the reasonable accommodation of continuing to work from home.

99.     Even though Defendant was aware of Ms. Shaw's disability and her need for reasonable accommodations, Defendant refused to accommodate Ms. Shaw's disability and told Ms. Shaw that she would be terminated for not coming into the office.

## SECOND CLAIM FOR RELIEF

### Retaliation for Engaging in Protected Activity in Violation of the ADA-AA

100.     Plaintiffs incorporate herein by reference all of the allegations made in previous paragraphs, and further alleges as follows:

101.     Ms. Lloyd engaged in a statutorily protected activity when she requested reasonable accommodations from Defendant and reported concerns of disability discrimination.

102.     After Ms. Lloyd made these requests, Defendant began scrutinizing her work and disciplining Ms. Lloyd for errors that fell well below a 1% error rate.  Defendant then terminated Ms. Lloyd for alleged poor performance.

103.     A causal relationship exists between Ms. Lloyd's protected activity and the adverse action she suffered.

104.    Ms. Shaw engaged in a statutorily protected activity when she requested reasonable accommodations from Defendant.

105.    Defendant then terminated Ms. Shaw for failing to check in, unexcused absences, and tardiness. Ms. Shaw had been granted and used reasonable accommodations of working from home and a flexible schedule for over three years without issue.

106.    A causal relationship exists between Ms. Shaw's protected activity and the adverse action she suffered.

## THIRD CLAIM FOR RELIEF

**Disability Discrimination (Disparate Treatment) in Violation of the ADA-AA**

107.    Plaintiffs incorporate herein by reference all of the allegations made in previous paragraphs, and further alleges as follows:

108.    Defendant treated Plaintiffs differently, took adverse action against them, and ultimately terminated their employment because they are individuals with disabilities.

109.    Defendant designed the Content Moderation Team for employees with health concerns who, as a result, had difficulty working full-time in the office.

110.    Defendant rescinded the work-from-home policy and knew or should have known that the decision would force employees with disabilities to either forfeit their accommodations or risk termination.

111.    Defendant discriminated against Plaintiffs by rescinded their work-from-home accommodation, failing to accommodate them, unduly scrutinizing their performance, and ultimately terminating their employment.

**FOURTH CLAIM FOR RELIEF**

**Disability Discrimination (Disparate Impact) in Violation of the ADA-AA**

112.    Plaintiffs incorporate herein by reference all of the allegations made in previous paragraphs, and further alleges as follows:

113.    Defendant adopted a neutral employment policy of no longer allowing employees to work from home.

114.    Defendant's policy had a disparate impact on individuals with disabilities by removing existing accommodations for employees with disabilities working on the Content Moderation Team. Individuals with disabilities face barriers to employment, including a lack of reasonable accommodations. Employees with disabilities are more likely than employees without disabilities to work from home; they are also more likely to work on a flexible schedule.

115.    As a result of Defendant's policy change, at least two content moderators were terminated and several others resigned.

116.    Ms. Lloyd requested the reasonable accommodation of working from home or driving to the Castle location.  Defendant denied these initial requests and forced to Ms. Lloyd to deplete her PTO. Defendant then began unnecessarily scrutinizing Ms. Lloyd's work and terminated her employment for alleged poor performance.

117.    Ms. Shaw requested the reasonable accommodation of working from home but was told she would be terminated if she did not come into the office. Ms. Shaw was then terminated for alleged poor performance and for not receiving permission prior to using her accrued PTO.

118.    Defendant's policy cannot be justified as a business necessity because the work of content moderators could be completed online, employees on the Content Moderation Team worked from home successfully for several years, the team led to cost savings, and Overstock reinstated the work-from-home option shortly after several employees on the Content Moderation Team were terminated or resigned.

119.    Defendant is a sophisticated online retailer that could have accommodated employees through the use of telecommunication software to allow for more regular team-based interactions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs MARKIE LLOYD and NATALIA SHAW request that this Honorable Court:

1.    Enter a permanent injunction enjoining Defendant from engaging in employment practices that discriminate on the basis of disability or retaliate against individuals for engaging in protected activity;

2.    Enter an order requiring Defendant to make Plaintiffs whole by placing Plaintiffs in the position they would have occupied in the absence of discrimination, including back-pay, front-pay, interest, and other benefits that would have accrued;

3.    Enter an order requiring Defendant to pay compensatory and punitive damages as a jury may assess;

4.      Award Plaintiffs their reasonable attorney fees and costs, pursuant to 42 U.S.C. §

12205; and

5.      Award such other and further relief as justice may require.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby requests a jury trial.

DATED this **17th** day of **December, 2018.**

/s/ Laura K. Boswell
LAURA K. BOSWELL
MARY ANNE DAVIES
DISABILITY LAW CENTER
*Attorneys for Plaintiff*
