FILED
2021 NOV 23 PM 12:07
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| MARKIE LLOYD and NATALIA SHAW,<br><br>     Plaintiffs.<br><br>v.<br><br>OVERSTOCK.COM, INC.,<br><br>     Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 42)**<br><br>Case No. 2:18-cv-00955<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiffs Markie Lloyd and Natalia Shaw brought this action against their former employer, Overstock.com, Inc. ("Overstock"), alleging disability discrimination and retaliation under the Americans with Disabilities Amendments Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (*See* Compl. ¶ 1, Doc. No. 2.)  Plaintiffs asserted claims for failure to accommodate, disparate treatment, disparate impact, and retaliation.  (Compl. ¶¶ 92–119, Doc. No. 2.)  Overstock moved for summary judgment on all claims.  (Mot. for Summ. J. ("MSJ"), Doc. No. 42.)  Plaintiffs opposed the motion in part, choosing not to pursue several claims.  (Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"), Doc. No. 46.)  The court held a hearing on the motion on November 1, 2021.  (*See* Doc. No. 53.)

For the reasons explained below, the motion is granted in part and denied in part.  The court[1] grants the motion as to the claims Plaintiffs have chosen not to pursue: Ms. Lloyd's failure-to-accommodate claim and Plaintiffs' disparate-impact claims.  The court denies the

---

[1] The parties consent to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 12.)

motion as to all other claims: Ms. Shaw's failure-to-accommodate claim, Plaintiffs' disparate-treatment claims, and Plaintiffs' retaliation claims.

## SUMMARY JUDGMENT STANDARD

Courts grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (internal quotation marks omitted). In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). But, "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

## RELEVANT FACTS

The court considers the following facts in determining the motion for summary judgment. All facts come from the parties' briefs and accompanying exhibits. The court draws all reasonable inferences in favor of Plaintiffs as the nonmoving parties.

<u>The Content Moderation Team</u>

Former Overstock president Stormy Simon identified the Content Moderation Team ("CMT") as a department which could accommodate people who needed to work from home, including people with disabilities such as multiple sclerosis ("MS").  (MSJ, Background and Context Facts ¶¶ 2, 4, Doc. No. 42; Opp'n, Pls.' Statement of Add'l Undisputed Material Facts ("SAUMF") ¶ 1, Doc. No. 46.)  Because website reviews were submitted all day and required constant moderation, content moderators could work from home with no set schedule and flexible hours.  (SAUMF ¶¶ 1–2.)  Beginning around 2012, Ms. Simon worked with the local MS society to identify and recruit potential employees with MS to work on the CMT.  (*Id.* ¶ 4.) Ms. Simon took a leave of absence in June 2016, and she resigned as president of Overstock in July 2016.  (*Id.* ¶ 19.)  Ms. Simon testified she was concerned that after she left, Overstock would undo what she had created.  (Ex. 3 to Opp'n, Dep. of Stormy Simon ("Simon Dep.") 83:11–25, Doc. No. 46-4.)

On June 24, 2016, Nariman Noursalehi, Senior Vice President of Marketing, emailed all CMT employees to announce he was ending the CMT's work-from-home program.  (MSJ, Statement of Undisputed Material Facts ("SUMF") ¶ 19, Doc. No. 42; Ex. K to MSJ, Noursalehi Email (June 24, 2016), Doc. No. 42-12.)  The email stated Mr. Noursalehi had decided to "cease the practice of working from home in a permanent/indefinite role," and "all full-time employees will need to complete their scheduled work week in the office beginning Tuesday July 5th." (Noursalehi Email, Doc. No. 42-12.)  The email provided, "We can still be flexible at times, but any work performed outside the office and/or normal working hours will need prior approval from your direct supervisor, and will be handled on a case by case basis."  (*Id.*)

<u>Ms. Shaw</u>

Ms. Shaw, who has MS, was recruited by Ms. Simon through the MS society and began working for Overstock as a content moderator in December 2012.  (SUMF ¶¶ 1–2, Doc. No. 42; Opp'n, Response to Statement of Undisputed Material Facts ("RSUMF") ¶ 2, Doc. No. 46.)  Ms. Shaw was supervised by Jardy Stokes, her direct supervisor, and Neal Lutz, the CMT manager.  (*See* SUMF ¶ 6(a), (e), Doc. No. 42.)  Mr. Stokes understood Ms. Shaw worked from home because she had MS.  (Ex. 5 to Opp'n, Dep. of Jardy Stokes ("Stokes Dep.") 82:5–9, Doc. No. 46-6.)  Mr. Lutz was aware Ms. Shaw worked from home "because of a disability or medical condition" and sometimes couldn't drive because of it.  (Ex. 14 to Opp'n, Dep. of Neal Lutz ("Lutz Dep.") 52:24–54:13, Doc. No. 46-15.)

According to Mr. Lutz, Ms. Shaw's productivity was low, and she "didn't let [Mr. Stokes] know her hours very much, even though he requested that she do so and check in every day."  (*Id.* at 41:16–18, 85:17–19.)  On June 15, 2016, Mr. Lutz and Mr. Stokes discussed going through the disciplinary process to begin the "formalities" of terminating Ms. Shaw and another employee but, instead, sought approval from their supervisors to end the work-from-home policy.  (Ex. 21 to Opp'n, Lutz Email to Killinger (June 15, 2016), Doc. No. 46-22 at 3–4.)  Mr. Lutz emailed his supervisors that he and Mr. Stokes believed ending the work-from-home policy "might be the best solution for everyone, including them [(the employees in question)]."  (*Id.*)  He stated, "We feel very strongly that neither of them will make the choice to come in to the office and work, and thus it solves that problem."  (*Id.*)

Mr. Lutz drafted the email announcing the end of the work-from-home policy—the same email Mr. Noursalehi ultimately sent to all CMT employees on June 24.  (Ex. 21 to Opp'n, Lutz Email to Noursalehi (June 20, 2016), Doc. No. 46-22 at 2.)  After drafting the email, Mr. Lutz

told Mr. Noursalehi that "[t]his week feels like a perpetual Christmas Eve for [Mr. Stokes] and I as we await the joy (or lack thereof) that will come to individuals upon receiving it." (Ex. 21 to Opp'n, Lutz Email to Noursalehi (June 23, 2016), Doc. No. 46-22 at 1–2.)

On June 23, Ms. Shaw was given a final written warning for performance issues, including poor communication. (Ex. 33 to Opp'n, Shaw Final Warning, Doc. No. 46-34.) The warning stated Ms. Shaw could "no longer work from home and is expected to work in the office," and would be given an unexcused absence "[i]f unable to come in." (*Id.*)

Ms. Shaw testified that after receiving the final warning, she made requests to Mr. Stokes and Mr. Lutz to continue working from home. (Ex. 2 to Opp'n, Dep. of Natalia Shaw ("Shaw Dep.") 36:22–37:19, 38:14–39:10, 43:17–20, Doc. No. 46-3.) She told Mr. Stokes she couldn't come into the office because she was too sick to drive and because working in an office was too hard for her to manage. (*Id.* at 38:20–23, 39:9–10, 43:17–20.) She reminded him that Stormy Simon hired her into a work-from-home position and she had always worked from home. (*Id.* at 38:23–25.) Mr. Stokes told Ms. Shaw she would be fired if she did not go into the office. (*Id.* at 39:2–3; Ex. 4 to Opp'n, Shaw Termination Letter, Doc. No. 46-5.)

Ms. Shaw was terminated on June 29, 2016. (Shaw Termination Letter, Doc. No. 46-5.) Her termination letter stated Ms. Shaw had been given a final warning and "was told she could no longer work from home and must report to the office." (*Id.*) It stated Ms. Shaw was told to "report to the office by Wednesday 6/29/2016 at 9:00 AM, or we would proceed with termination," and that she "did not report to work." (*Id.*) The letter also stated Ms. Shaw had seventeen unexcused absences in the final six months of her employment. (*Id.*)

Ms. Simon, Ms. Shaw, Ms. Lloyd, and another employee testified that content moderators had flexible schedules without set hours and did not have to be logged into the

system at any specific time.  (Ex. 1 to Opp'n, Dep. of Amanda Leary ("Leary Dep.") 7:24–8:17,

Doc. No. 46-2; Shaw Dep. 26:8–22, Doc. No. 46-3; Simon Dep. 98:20–99:13, Doc. No. 46-4;

Ex. 8 to Opp'n, Dep. of Markie Lloyd ("Lloyd Dep.") 35:14–23, Doc. No. 46-9.)

<u>Ms. Lloyd</u>

Ms. Lloyd was hired by Overstock as a customer service agent in October 2011.  (SUMF

¶ 7, Doc. No. 42.)  After being diagnosed with MS and missing time at work due to her illness,

Ms. Lloyd transferred to the CMT in 2014.  (*Id.*; RSUMF ¶ 8, Doc. No. 46.)  Mr. Stokes

expressed frustration that employees such as Ms. Lloyd were "dumped" on his team when they

were not performing well in other positions.  (Stokes Dep. 17:19–23, 19:18–19, 22:3–13, Doc.

No. 46-6.)  He testified he had a difficult time working with Ms. Lloyd because "it felt like her

health issues only were an issue when it was something I wanted her to do."  (*Id.* at 97:22–25.)

In Mr. Lutz's email recommending ending the work-from-home policy, he stated Ms. Lloyd was

not a "star player" and he would be excited to replace her if she chose to resign.  (Lutz Email to

Killinger (June 15, 2016), Doc. No. 46-22 at 3.)

After receiving Mr. Noursalehi's email ending the work-from-home policy, Ms. Lloyd

asked Mr. Stokes if she could carpool to a closer location.  (Ex. 23 to Opp'n, Lloyd Chat with

Stokes (June 28, 2016), Doc. No. 46-24.)  Mr. Stokes denied her request and required Ms. Lloyd

to work in the main office or not at all.  (*Id.*; Stokes Dep. 99:14–100:3, Doc. No. 46-6; Lloyd

Dep. 150:21–151:15, Doc. No. 46-9.)  Ms. Lloyd was unaware of Overstock's procedures for

accommodation requests, so she instead applied for leave under the Family and Medical Leave

Act ("FMLA").  (Lloyd Dep. 148:13–20, 149:14–150:14, Doc. No. 46-9; Ex. 11 to Opp'n, Lloyd

Email to Stokes (July 5, 2016), Doc. No. 46-12.)  On July 5, 2016, she informed Mr. Stokes that

her doctor advised her not to drive and "suggested that I see about talking to someone in HR

about working from home before she completely fills out my [FMLA] paperwork because my MS has been relapsing more." (Lloyd Email to Stokes (July 5, 2016), Doc. No. 46-12.) She also texted him that she was "going through a really bad relapse with [her] MS" and expressed concern that he was not letting her work unless she went against her doctor's instructions not to drive. (Ex. 24 to Opp'n, Lloyd and Stokes Text Messages, Doc. No. 46-25.)

On July 6, Ms. Lloyd contacted human resources to request FMLA leave because her MS prevented her from driving. (Ex. 25 to Opp'n, Lloyd Email to Sweat (July 6, 2016), Doc. No. 46-26 at 1.) She explained she could still work from home, but that her supervisor indicated her absences would be unexcused unless she reported to the office for work. (*Id.*) On July 18, Ms. Lloyd was approved for intermittent FMLA leave and was informed of the ADA process for the first time. (Ex. 25 to Opp'n, Emails between Lloyd and Sweat (July 18, 2016), Doc. No. 46-26 at 3; Lloyd Dep. 149:14–150:14, Doc. No. 46-9.) On July 19, Ms. Lloyd requested Overstock's ADA paperwork, stating "[a]ll I want to do is work but I'm being forced to use my FMLA because I can't drive out there." (Ex. 25 to Opp'n, Lloyd Email to Sweat (July 19, 2016), Doc. No. 46-26 at 4.) She submitted an ADA accommodation request form the same day. (Ex. 10 to Opp'n, Application for Accommodation, Doc. No. 46-11.)

On July 25, Mr. Stokes sent a chat message to Ms. Lloyd, telling her she must stop working from home. (Ex. 19 to Opp'n, Lloyd and Stokes Chat (July 25, 2016), Doc. No. 46-20.) Although she told him she was "not able to drive due to medical issues," he responded that she "was not approved to work from home" and would need to clock out and report to the office. (*Id.*) However, on July 29, Overstock's human resources director granted Ms. Lloyd a temporary work-from-home accommodation, which was made permanent in August. (Ex. 12 to Opp'n,

Osterberg Email to Lloyd (July 29, 2016), Doc. No. 46-13 at 6; Ex. 26 to Opp'n, Osterberg

Letter to Lloyd (Aug. 23, 2016), Doc. No. 46-27.)

On August 1, Mr. Stokes informed Ms. Lloyd that he had been contacted about a review

containing profanity which she had approved and, after a search, he found six instances of

inappropriate reviews going back to April 2016.  (Ex. 15 to Opp'n, Stokes Email to Lloyd (Aug.

1, 2016), Doc. No. 46-16.)  Ms. Lloyd testified it was not typical for Mr. Stokes to check her

reviews so far back.  (Lloyd Dep. 157:2–6, Doc. No. 46-9.)  Although Mr. Stokes testified his

supervisor had directed him to conduct the audit for all team members, his supervisor testified

she left audits to his discretion.  (Stokes Dep. 33:14–24, 35:3–9, Doc. No. 46-6; Ex. 27 to Opp'n,

Dep. of Leslie Killinger ("Killinger Dep.") 46:9–14, Doc. No. 46-28.)  Mr. Stokes also testified

he occasionally pulled recent reviews to check for errors but had no regular practice of doing so

and, at times, went months without performing quality control checks.  (Stokes Dep. 30:19–24,

31:21–32:7, Doc. No. 46-6.)

On September 28, 2016, Ms. Lloyd raised concerns to Overstock about her

accommodation and disability discrimination in a letter from the Disability Law Center.  (*See* Ex.

28 to Opp'n, James Letter to EEOC (Sept. 22, 2017), Doc. No. 46-29 at 2.)  The next day, Mr.

Stokes issued Ms. Lloyd a final warning for an additional five reviews with inappropriate

language.  (Ex. 30 to Opp'n, Lloyd Final Warning, Doc. No. 46-31.)

Ms. Lloyd was terminated on November 9, 2016.  (Ex. 17 to Opp'n, Lloyd Termination

Letter, Doc. No. 46-18.)  The termination letter stated Ms. Lloyd had approved sixteen more

reviews with inappropriate language since October 1, in addition to the previously identified

inappropriate reviews.  (*Id.*)  The termination letter did not mention other performance issues.

(*Id.*)

The CMT had guidelines for what constituted inappropriate content, but there were no standards to measure an employee's accuracy in moderating reviews.  (Killinger Dep. 44:1–45:2, Doc. No. 46-28.)  Content moderators were expected to moderate one hundred reviews per hour. (Lloyd Dep. 36:10–14, Doc. No. 46-9; Stokes Dep. 27:15–22, 31:11–17, Doc. No. 46-6.) Overstock managers acknowledged it would be unrealistic to moderate with one-hundred percent accuracy.  (Killinger Dep. 44:17–45:13, Doc. No. 46-28; Lutz Dep. 25:14–26:5, Doc. No. 46-15.)  Another moderator had also approved reviews with inappropriate content and had problems with productivity, but she was not terminated.  (Stokes Dep. 34:6–16, 112:7–113:13, Doc. No. 46-6.)

## DISCUSSION

Plaintiffs' Complaint asserts four causes of action against Overstock for violations of the ADA: (1) failure to accommodate, (2) discrimination based on disparate treatment, (3) discrimination based on disparate impact, and (4) retaliation.  (Compl. ¶¶ 92–119, Doc. No. 2.)  Overstock argues it is entitled to summary judgment on all claims.  (MSJ, Doc. No. 42.) Plaintiffs do not address Ms. Lloyd's failure-to-accommodate claim or Plaintiffs' disparate-impact claims in their opposition brief, and they confirmed at the hearing they are not pursuing these claims.  (*See* Opp'n, Doc. No. 46.)  However, Plaintiffs argue the record evidence raises triable disputes of material fact on the remaining claims.  (*Id.*)

For the reasons set forth below, Overstock is entitled to summary judgment on the claims Plaintiffs have chosen not to pursue: Ms. Lloyd's failure-to-accommodate claim and Plaintiffs' disparate-impact claims.  However, Plaintiffs have presented sufficient evidence to preclude summary judgment on the remaining claims: Ms. Shaw's failure-to-accommodate claim, Plaintiffs' disparate-treatment claims, and Plaintiffs' retaliation claims.

A. <u>Failure to Accommodate</u>

To succeed on a failure-to-accommodate claim, a plaintiff must make a prima facie case that "(1) she was disabled, (2) she was otherwise qualified, (3) she requested a plausibly reasonable accommodation, and (4) [the employer] refused to accommodate her disability." *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020). If the plaintiff establishes a prima facie case, the burden then shifts to the employer "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Id.* (internal quotation marks omitted).

Overstock does not dispute Ms. Shaw and Ms. Lloyd were disabled and were otherwise qualified for the content moderator position. (*See* MSJ 20–21, Doc. No. 42.) Overstock also does not argue a work-from-home accommodation was unreasonable. (*See id.*) Accordingly, the court examines the other elements as they relate to each plaintiff.

1. <u>Ms. Shaw</u>

Overstock argues Ms. Shaw never requested an accommodation, pointing to her testimony that she did not "fill out an ADA application" or "request an ADA accommodation." (MSJ 22, Doc. No. 42; Shaw Dep. 24:2–11, Doc. No. 46-3.) Overstock also argues Ms. Shaw's disability was accommodated because she "always worked from home," from the beginning of her employment. (MSJ 22, Doc. No. 42.)

Plaintiffs argue Ms. Shaw's testimony that she requested to continue working from home because she was too sick to drive raises a genuine dispute of material fact as to whether she requested a reasonable accommodation. (Opp'n 20–23, Doc. No. 46.) Plaintiffs also argue

Overstock removed the preexisting work-from-home accommodation and refused to reinstate it when Ms. Shaw requested to continue working from home.  (*Id.* at 23–25.)

A request for accommodation "does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'" but "it nonetheless must make clear that the employee wants assistance for his or her disability." *Equal Emp't Opportunity Comm'n v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (internal quotation marks omitted) (emphasis omitted).  "That is, the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id.* (internal quotation marks omitted).

Plaintiffs have presented sufficient evidence to support a finding that Ms. Shaw requested an accommodation.  Ms. Shaw's testimony that she did not specifically request an "ADA accommodation" is not determinative, because she was not required to reference the ADA or "formally invoke the magic words 'reasonable accommodation.'" *C.R. England*, 644 F.3d at 1049 (internal quotation marks omitted).  Ms. Shaw testified she asked Mr. Stokes and Mr. Lutz to continue working from home and told them she couldn't come into the office because she was too sick to drive.  (Shaw Dep. 36:22–37:19, 38:14–39:10, 43:17–20, Doc. No. 46-3.)  Her supervisors were aware of her disability and aware she worked from home because of her disability—indeed, Mr. Lutz acknowledged Ms. Shaw sometimes couldn't drive because of it. (Lutz Dep. 52:24–54:13, Doc. No. 46-15; Stokes Dep. 82:5–9, Doc. No. 46-6.)  Given this context, Ms. Shaw's statements were sufficient to put her supervisors on notice that she was requesting an accommodation for her disability.

Plaintiffs have also presented sufficient evidence that Overstock refused to accommodate Ms. Shaw's disability.  Although Ms. Shaw was hired into a position which accommodated her

11

MS by allowing her to work from home, the evidence supports a finding that Overstock removed this accommodation in June 2016.  Ms. Shaw was given a final warning stating she "will no longer work from home and is expected to work in the office."  (Shaw Final Warning, Doc. No. 46-34; *see also* Shaw Termination Letter, Doc. No. 46-5.)  Ms. Shaw's supervisor then denied her request to continue working from home because she was too sick to drive, instead telling her she must report to the office or be terminated.  (Shaw Termination Letter, Doc. No. 46-5.)  The termination letter states "[s]he was told she could no longer work from home and must report to the office," and that she was terminated because she "did not report to work."  (*Id.*)  This evidence is sufficient to show Overstock refused to accommodate Ms. Shaw's disability, by removing her preexisting work-from-home accommodation and denying her request to continue working from home.

The evidence set forth above, viewed in the light most favorable to Ms. Shaw, is sufficient to support a prima facie case that Overstock failed to accommodate Ms. Shaw's disability.  Overstock has not presented any argument or evidence supporting affirmative defenses to this claim.  Accordingly, Overstock is not entitled to summary judgment on Ms. Shaw's failure-to-accommodate claim.

## 2. Ms. Lloyd

Overstock argues Ms. Lloyd's failure-to-accommodate claim fails because her request for an accommodation was granted and she was permitted to continue working from home until she was terminated.  (MSJ 22–23, Doc. No. 42.)  Plaintiffs did not address this claim in their opposition, and they confirmed at the hearing that Ms. Lloyd is not pursuing this claim.  Because of this and because Plaintiffs do not dispute Ms. Lloyd's request for an accommodation was

eventually granted, Overstock is entitled to summary judgment on Ms. Lloyd's failure-to-accommodate claim.

   B. <u>Disparate Treatment</u>

      To establish a prima facie case for disability discrimination based on disparate treatment, a plaintiff must demonstrate (1) she was disabled; (2) she was otherwise qualified; and (3) she "suffered discrimination by an employer . . . because of that disability. *C.R. England*, 644 F.3d at 1037–38 (internal quotation marks omitted). "In order to demonstrate discrimination, a plaintiff generally must show that [she] has suffered an adverse employment action because of the disability." *Id.* at 1038 (internal quotation marks omitted). "This requires some affirmative evidence that the disability was a determinative factor in [the employer's] decision." *Edmonds-Radford v. Southwest Airlines Co.*, __ F.4th __, 2021 U.S. App. LEXIS 33124, at *24 (10th Cir. 2021).

      If a plaintiff offers no direct evidence of discrimination, the court applies the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See C.R. England*, 644 F.3d at 1038–39. A plaintiff must first demonstrate a prima facie case of discrimination, as set forth above. *Id.* at 1038 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). The burden then "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–03). "If the defendant proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely 'pretextual.'" *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 804–05).

      "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln v. BNSF Ry. Co.*,

900 F.3d 1166, 1193 (10th Cir. 2018) (internal quotation marks omitted).  "This is often accomplished by revealing weakness, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. (internal quotation marks omitted).  "Pretext may also be shown by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012) (internal quotation marks omitted).  In determining whether the employer's proffered reason was pretextual, the court "examine[s] the facts as they appear to the person making the decision." *C.R. England*, 644 F.3d at 1044 (internal quotation marks omitted) (emphasis omitted).

Overstock assumes, without conceding, that Plaintiffs can make a prima facie case of disparate treatment.  (MSJ 26, Doc. No. 42.)  But Overstock argues Ms. Shaw and Ms. Lloyd were terminated for poor performance and not for any discriminatory reason.  (*Id.* at 26–27.)  Plaintiffs, on the other hand, argue the evidence supports an inference that Mr. Lutz and Mr. Stokes acted with discriminatory intent when they terminated Ms. Shaw and Ms. Lloyd, and that Overstock's proffered reasons are pretextual.  (Opp'n 26–33, Doc. No. 46.)

1. Ms. Shaw

   i. *Prima Facie Case*

Plaintiffs have presented sufficient evidence to support a prima facie case that Ms. Shaw was terminated because of her disability.  As discussed above, Ms. Shaw presented evidence that her supervisors were aware she worked from home due to her MS, but they informed her she was no longer allowed to work from home in June 2016.  (Lutz Dep. 52:24–54:13, Doc. No. 46-15; Stokes Dep. 82:5–9, Doc. No. 46-6; Shaw Final Warning, Doc. No. 46-34; Shaw Termination

Letter, Doc. No. 46-5.)  Despite her requests to continue working from home because she was too sick to drive, she was terminated for failing to report to the office.  (Shaw Dep. 36:22–37:19, 38:14–39:10, 43:17–20, Doc. No. 46-3; Shaw Termination Letter, Doc. No. 46-5.)  This evidence is sufficient to support a prima facie case that Ms. Shaw's disability was a determinative factor in the termination decision.

### ii. Legitimate Nondiscriminatory Reason

Overstock argues Ms. Shaw was terminated for failing to communicate with her supervisor, not showing up for work when she said she would, and not telling her supervisor that she was not showing up for work, citing Mr. Lutz's testimony that these reasons were "cause for termination."  (MSJ 26–27, Doc. No. 42; Lutz Dep. 118:14–24, Doc. No. 46-15.)  Overstock also points to the termination letter's statement that Ms. Shaw had seventeen unexcused absences in the final six months of her employment.  (MSJ 26, Doc. No. 42; Shaw Termination Letter, Doc. No. 46-5.)  With this evidence, Overstock has met its burden to proffer a legitimate, nondiscriminatory reason for termination.  Thus, the burden shifts to Plaintiffs to demonstrate the stated reasons are pretextual.

### iii. Pretext

Plaintiffs argue Overstock's proffered reasons for terminating Ms. Shaw are pretextual because (1) there is evidence Mr. Lutz and Mr. Stokes schemed to force Ms. Shaw to quit by ending the work-from-home policy; (2) Ms. Shaw's termination letter stated she was terminated for failing to report to work rather than the performance issues identified in her final warning; (3) Mr. Lutz offered inconsistent accounts of his involvement in Ms. Shaw's termination; and (4) Mr. Lutz and Mr. Stokes failed to follow Overstock's accommodation and disciplinary policies.  (Opp'n 28–32, Doc. No. 46.)

Plaintiffs have presented sufficient evidence to support a finding of pretext. As Plaintiffs note, the termination letter itself identified Ms. Shaw's failure to report to work in the office, rather than other performance issues, as the reason for her termination. (Shaw Termination Letter, Doc. No. 46-5.) And, as described above, Plaintiffs have presented evidence that Ms. Shaw's supervisors were aware she worked from home due to her disability, yet they denied her accommodation request to continue working from home. Given this context, a reasonable factfinder could infer Ms. Shaw's supervisors acted with discriminatory intent when they terminated her for failing to report to the office.

Notably, Overstock does not argue Ms. Shaw's failure to report to the office—the reason stated the termination letter—was a legitimate, nondiscriminatory reason for Ms. Shaw's termination. Instead, Overstock argued at the hearing that Ms. Shaw was actually terminated based on the performance issues identified in her final warning notice. Overstock also claimed Ms. Shaw was never required to work in the office but, rather, was only required to come to the office for a meeting on the day she was terminated. With these arguments, Overstock implicitly asks the court to draw inferences contrary to the plain language of the termination letter. This would turn the summary judgment standard on its head. The termination letter plainly states Ms. Shaw "was told she could no longer work from home and must report to the office," was informed she would be terminated if she did not "report to the office by Wednesday 6/29/2016," and was terminated because she "did not report to work." (Shaw Termination Letter, Doc. No. 46-5.) All inferences must be drawn in favor of Ms. Shaw as the nonmoving party. But in this instance, no inferences are necessary—the court simply assumes the letter means what it says.

Beyond the termination letter itself, Mr. Lutz's email regarding ending the work-from-home policy provides further evidence of discriminatory intent. In his June 15 email, Mr. Lutz

recommended ending the work-from-home policy rather than going through the "formalities" of terminating Ms. Shaw for cause, stating his belief that Ms. Shaw would not "make the choice to come in to the office and work, and thus it solves that problem." (Lutz Email to Killinger (June 15, 2016), Doc. No. 46-22 at 3.) Viewed in the light most favorable to Ms. Shaw, this supports a finding that Ms. Shaw's supervisors intentionally removed her work-from-home accommodation—knowing her disability would prevent her from working in the office—in order to end her employment.

Plaintiffs have also presented evidence undermining Overstock's claim that Ms. Shaw was terminated based on prior unexcused absences. Ms. Simon, Ms. Shaw, Ms. Lloyd, and another employee testified that content moderators had flexible schedules without set hours and did not have to be logged into the system at any specific time. (Leary Dep. 7:24–8:17, Doc. No. 46-2; Shaw Dep. 26:8–22, Doc. No. 46-3; Simon Dep. 98:20–99:13, Doc. No. 46-4; Lloyd Dep. 35:24–36:3, Doc. No. 46–9.) This suggests Ms. Shaw could not accrue unexcused absences and provides further support for a finding that the proffered reasons were pretextual.

Overstock argues it could not have acted with discriminatory intent because it allowed another content moderator with MS to continue working from home after Mr. Noursalehi's email ending the work-from-home policy. (MSJ 31–32, Doc. No. 42.) Overstock asserts the only difference between Ms. Shaw and the other employee is that Ms. Shaw had performance issues. (*Id.* at 32.) However, in his email recommending ending the work-from-home policy, Mr. Lutz explained that an exception could be made for this other employee because she only worked a few hours per week. (Lutz Email to Killinger (June 15, 2016), Doc. No. 46-22 at 3.) Regardless, Ms. Shaw need not show that Overstock discriminated against every employee with

MS, but only that discrimination was a "primary factor" in her own termination.  *See Lincoln*,

900 F.3d at 1193.  The evidence set forth above is sufficient to support such a finding.

Overstock also argues it could not have discriminated against Plaintiffs because

"Overstock is a friend to the disabled," pointing to the fact that Overstock specifically

recruited people with disabilities to work in a department which accommodated them.  (MSJ

27–28, Doc. No. 42.)  However, a general policy of recruiting and accommodating disabled

employees is insufficient to show, as a matter of law, that Overstock did not discriminate

against specific disabled employees.  Moreover, Plaintiffs have presented evidence these

policies were established by former Overstock president Stormy Simon and dismantled when

she left, shortly before Plaintiffs were terminated.  The same month Ms. Simon took a leave of

absence, Overstock ended the work-from-home policy on the CMT, even though the CMT

supervisors knew Ms. Shaw and Ms. Lloyd worked from home because of their MS.  Indeed, a

stated goal of ending the work-from-home policy was forcing Ms. Shaw to resign.  Thus,

Overstock's prior recruitment and accommodation of disabled employees is insufficient to

establish as a matter of law that Overstock did not discriminate against Plaintiffs when it

terminated them.

For these reasons, Overstock is not entitled to summary judgment on Ms. Shaw's

disparate-treatment claim.  Because the above evidence supports a finding of pretext, the court

need not address Plaintiffs' other arguments.

    2.  <u>Ms. Lloyd</u>

        i.  *Prima Facie Case*

Plaintiffs have presented sufficient evidence to support a prima facie case that Ms. Lloyd

was terminated because of her disability.  Plaintiffs presented evidence from which

discriminatory intent could be inferred, including Mr. Stokes' testimony that employees like Ms. Lloyd were "dumped" on his team and that he had difficulty working with her because of her health issues.  (Stokes Dep. 17:19–23, 19:18–19, 22:3–13, 97:22–25, Doc. No. 46-6.) Additionally, even though he knew Ms. Lloyd worked from home due to her MS, Mr. Lutz expressed that he would be excited to replace Ms. Lloyd if ending the work-from-home policy caused her to resign.  (Lutz Email to Killinger (June 15, 2016), Doc. No. 46-22 at 3.)  These statements support an inference of discriminatory animus toward Ms. Lloyd due to her disability.

Plaintiffs have also presented evidence that Mr. Stokes began scrutinizing Ms. Lloyd's work for moderation errors—which were later cited as the reason for her termination—after Mr. Stokes initially refused to allow her to continue working from home, and only days after her accommodation request was approved by human resources.  The timing of these events supports an inference that Ms. Lloyd's supervisors chose to terminate her rather than allow her to continue working from home with a disability accommodation.

Viewed in the light most favorable to Ms. Lloyd as the nonmoving party, this evidence is sufficient to support a prima facie case that Ms. Lloyd was terminated because of her disability.

ii.  *Legitimate Nondiscriminatory Reason*

Overstock claims Ms. Lloyd was terminated for performance issues, including poor communication, not "hitting [Overstock's] preferred numbers," and making moderation errors. (*See* MSJ 27–28, Doc. No. 42.)  Because Overstock has proffered legitimate, nondiscriminatory reasons for termination, the burden shifts to Ms. Lloyd to demonstrate these reasons were pretextual.

iii. *Pretext*

Ms. Lloyd argues Overstock's proffered reasons are pretextual because (1) prior productivity and communication issues were resolved before her termination; (2) Mr. Stokes scrutinized Ms. Lloyd's work for moderation errors only after her accommodation request was granted; (3) her moderation error rate was less than one percent; and (4) another employee who had made similar errors was not terminated.  (Opp'n 37–41, Doc. No. 46.)

Plaintiffs have presented sufficient evidence to support a finding that Overstock's proffered reasons were pretextual.  First, Ms. Lloyd's final warning and termination letter do not mention productivity or communication issues.  (Lloyd Final Warning, Doc. No. 46-31; Lloyd Termination Letter, Doc. No. 46-18.)  Ms. Lloyd received a written warning for poor productivity and communication in 2015, but a subsequent performance review in March 2016 indicated these issues were resolved.  (Ex. 13 to Opp'n, Lloyd Written Warning (Oct. 21, 2015), Doc. No. 46-14; Ex. 6 To Opp'n, Lloyd Performance Review (March 25, 2016), Doc. No. 46-7 at 1.)  This evidence supports a finding that these issues were not the basis for Ms. Lloyd's termination.

Second, Ms. Lloyd presented evidence suggesting the reason for termination stated in her termination letter—her approval of reviews with profanity—was unworthy of credence.  Based on the expected rate of one hundred reviews per hour, Ms. Lloyd estimates she moderated more than one hundred thousand reviews during the time period in which inappropriate reviews were identified, meaning she had an error rate of less than one percent when she was terminated. (Opp'n 39–40, Doc. No. 42; *see also* Lloyd Dep. 36:10–14, Doc. No. 46-9; Stokes Dep. 27:15–22, 31:11–17, Doc. No. 46-6; Lloyd Termination Letter, Doc. No. 46-18.)  Ms. Lloyd also presented evidence that there were no set standards for moderation accuracy, CMT supervisors

20

did not expect one-hundred percent accuracy, and another employee who approved reviews with profanity was not terminated.  (Killinger Dep. 44:1–45:13, Doc. No. 46-28; Lutz Dep. 25:14–26:5, Doc. No. 46-15; Stokes Dep. 34:6–16, 112:7–113:13, Doc. No. 46-6.)  This evidence undermines Overstock's proffered justification and supports a finding of pretext.

Finally, as set forth above, Ms. Lloyd has presented other evidence suggesting her supervisors were motivated by discriminatory animus, including Mr. Stokes' testimony that employees like Ms. Lloyd were "dumped" on his team, and the fact that he began scrutinizing her work for errors only days after human resources granted Ms. Lloyd's accommodation request over his prior denials.  This evidence gives rise to an inference that Mr. Stokes was motivated by discriminatory intent and used moderation errors as a pretext to terminate Ms. Lloyd.

For these reasons, Overstock is not entitled to summary judgment on Ms. Lloyd's disparate-treatment claim.

### C.  Disparate Impact

To prove disability discrimination based on disparate impact, a plaintiff must show "a specific policy caused a significant disparate effect on a protected group."  *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007) (quotation marks omitted).  Overstock argues Plaintiffs have no evidence to support a disparate-impact claim.  (MSJ 25, Doc. No. 42.) Plaintiffs did not address this claim in their opposition, and they confirmed at the hearing they are not pursuing this claim.  Because Plaintiffs have not offered evidence supporting this claim, Overstock is entitled to summary judgment on Plaintiffs' disparate-impact claim.

### D.  Retaliation

To establish a prima facie case of retaliation under the ADA, an employee must show (1) she engaged in protected activity; (2) she suffered a materially adverse action by her

employer either after or contemporaneous with the protected activity; and (3) a causal connection exists between the protected activity and the adverse action. *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). A request for accommodation is a protected activity under the ADA. *Lincoln*, 900 F.3d at 1209. A causal connection may be inferred based on close temporal proximity between the protected activity and the adverse action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994). A plaintiff may also demonstrate causation by showing a pattern of retaliatory conduct beginning shortly after the protected activity and culminating in termination. *Marx v. Schnuck Mkts.*, 76 F.3d 324, 329 (10th Cir. 1996). Where a plaintiff relies on circumstantial evidence to establish a retaliation claim, the *McDonnell Douglas* burden-shifting framework applies. *Lincoln*, 900 F.3d at 1209.

1. Ms. Shaw

i. *Prima Facie Case*

Overstock argues Ms. Shaw did not engage in a protected activity because she never requested an accommodation. (MSJ 30, Doc. No. 42.) However, as discussed above, Plaintiffs have presented sufficient evidence to support a finding that Ms. Shaw requested the accommodation of continuing to work from home after she was told she could no longer do so in June 2016. This evidence is sufficient to show Ms. Shaw engaged in a protected activity.

Plaintiffs have also presented sufficient evidence to demonstrate a causal connection between Ms. Shaw's protected activity and her termination. Ms. Shaw was informed she could no longer work from home on June 23, 2016, and she was terminated on June 29, 2016. During that time, Ms. Shaw requested the accommodation of continuing to work from home, and she was terminated only days later. This close temporal proximity between her accommodation

request and her termination is evidence of a causal connection. Plaintiffs also presented evidence that Ms. Shaw's supervisors resented the work-from-home accommodations provided to CMT employees and asked to end the work-from-home policy with the stated goal of forcing Ms. Shaw to resign. Viewed in the light most favorable to Ms. Shaw, this evidence supports an inference that Ms. Shaw was terminated in retaliation for using the work-from-home accommodation and for requesting that this accommodation continue.

For these reasons, Plaintiffs have presented sufficient evidence to support a prima facie case of retaliation for Ms. Shaw.

### ii. *Legitimate Nondiscriminatory Reason and Pretext*

Overstock argues Ms. Shaw was terminated solely based on performance issues. As set forth above in the discussion of her disparate-impact claim, Ms. Shaw presented sufficient evidence to support a finding that Overstock's proffered reasons for the termination were pretextual, including the fact that the termination letter identified her failure to report to work in the office as the reason for her termination. Accordingly, Overstock is not entitled to summary judgment on Ms. Shaw's retaliation claim.

### 2. Ms. Lloyd

### i. *Prima Facie Case*

Overstock acknowledges Ms. Lloyd requested an accommodation but argues this request had nothing to do with her termination. (MSJ 30, Doc. No. 42.) However, Plaintiffs presented evidence that Ms. Lloyd's last protected activity occurred when she complained of discrimination on September 28, 2016. (*See* James Letter to EEOC (Sept. 22, 2017), Doc. No. 46-29 at 2.) The temporal proximity between this complaint and her termination on November 9, 2016, a month and a half later, is evidence of a causal connection sufficient to support a prima

facie case.  *See Ramirez*, 41 F.3d at 596 (finding a causal connection could be inferred where an adverse action occurred within a month and a half of an employee's protected activity). Plaintiffs have also presented evidence of a pattern of retaliatory conduct culminating in Ms. Lloyd's termination, including evidence that Mr. Stokes began scrutinizing her work for moderation errors mere days after human resources granted her accommodation request, and ultimately cited moderation errors as the reason for her termination several months later.  This evidence provides additional support for a prima facie case of retaliation for Ms. Lloyd.

ii.   *Legitimate, Nondiscriminatory Reason and Pretext*

Overstock argues Ms. Lloyd was terminated solely due to performance issues, including poor communication, low productivity, and moderation errors.  (MSJ 30–31, Doc. No. 42.)  As set forth above in the discussion of her disparate-impact claim, Ms. Lloyd has presented sufficient evidence to support a finding that Overstock's proffered reasons for the termination were pretextual, including evidence that her error rate was less than one percent and that prior performance issues were resolved.  For these reasons, Overstock is not entitled to summary judgment on Ms. Lloyd's retaliation claim.

<u>CONCLUSION</u>

Where Plaintiffs failed to offer sufficient supporting evidence in favor of Ms. Lloyd's failure-to-accommodate claim and Plaintiffs' disparate-impact claims, the court GRANTS Overstock's motion and enters summary judgment in favor of Overstock on these claims. However, drawing all reasonable inferences in favor of Plaintiffs, the court DENIES Overstock's

motion as to Ms. Shaw's failure-to-accommodate claim, Plaintiffs' disparate-treatment claims,

and Plaintiffs' retaliation claims.

DATED this 23rd day of November, 2021.

BY THE COURT:

_Daphne A. Oberg_
Daphne A. Oberg
United States Magistrate Judge